Good morning to counsel and the court. May it please the court, my name is John Campo and I am counsel for the appellants Anshuman and Renuka Nadkarni. I would like to reserve five minutes for rebuttal. There's a simple issue before the court today. It isn't a question of law, but even more specifically, it's a question regarding the interpretation of a single insurance policy. The one thing this court is not being asked to rule on is whether this insurance policy potentially covers the risk of wrongful eviction because the policy is unequivocal and clear that it does cover wrongful eviction and the only issue before this court is whether this policy issued by GEICO clearly articulates and identifies what has to happen in order for that to be covered. I focused very much in our brief on the language of that policy, but since it is where I intend to spend most of my time today, I do just want to quickly read it. The insuring agreement of the GEICO policy is not in one place. It's a very simple one-line insuring agreement and you have to then draw from other portions of the policy to reconstruct it. But as reconstructed, it says that we, GEICO, pay damages on behalf of an insured arising out of an event, including continuous or repeated exposure to conditions which result in injury arising out of wrongful eviction, which takes place anywhere in the world during the time this policy is enforced, provided that suit is brought in the U.S. Under that language, the underlying action brought by the plaintiffs was covered by this policy. Mr. Conpo, I'm having a little bit of trouble getting around what to me is a fairly explicit condition in the agreement that says the policy applies to personal injury. Hold on a second. The policy applies to the personal injury which takes place during the time this policy is enforced. Do you dispute that? With all due respect, Your Honor, absolutely. I do not believe that what you have read is what the policy says. The insuring agreement of this policy simply says we pay damages on behalf of an insured arising out of an occurrence, subject to the terms and conditions of this policy. Right. But damages are defined, right? Yes. As arising out of our agreement because of personal injury or property damage covered by this policy. Yes. But there is nothing in the policy that restricts coverage to an event that happens while the policy is enforced. And in that regard... Why not? Hold it right there. That's my problem. We will pay damages on behalf of an insured arising out of an occurrence, subject to the terms and position of the policy. That strikes me as an event. Okay. Well, there was an event here. There was an alleged wrongful eviction. So there is... defined as, as I just said, a personal injury or property damage. And it seems to me that you've got a problem because on May 1, there was a completed, what I'm going to call a tort, an action, a cause of action. Isn't there for wrongful eviction? I would submit no... And if not, why not? That's my problem. If not, why not? Thank you. And I will tell you why not. Two reasons. The first is that under the San Francisco ordinance, an owner may legally move in. And that's what my clients did. The tenants were paid to move out. They were fully compensated at that time. And as of the time that they were evicted, they had no damages. Okay. Right there, their response is, as you know, that this was a wrongful eviction and that your clients had the intent earlier than that to not move in. And it seems to me that you're arguing they have to wait, you know, the three years before we determine that your clients were going to, in bad faith, not move in. Where does that... How is that consistent with the ordinance? As explained by the court in Sylvay v. Riley, Your Honor, that is a statute of limitations case. And interpreting... Exactly. And your case is not a statute of limitations case. Go ahead. It isn't. But what the court held is that the limitations period does not begin to run until a plaintiff discovers or could have discovered through the exercise of reasonable diligence, and this is the important part, all facts essential to her cause of action. But that's just the discovery rule for purposes of tolling a statute of limitations. That doesn't mean that the person, that litigant, couldn't have filed suit having had a, you know, completed cause of action. But the whole point of Sylvay, where the court said, you can't know whether you have the facts until those facts happen. And under the San Francisco ordinance, none of the facts that were relied upon by this plaintiff can happen until after the eviction. They can't. You can't file the paperwork with the city. You cannot move in. You cannot remain. Every fact relevant to a determination of liability can only happen after the fact. So you would have to show... Do you agree with this? You would have to show that as of May 1, they could not have filed suit. They wouldn't have had a cause of action. No, I look at it differently, Your Honor. Well, number one, they don't have a cause of action. They do not have a cause of action. Well, they think they do. So I think that's the question. If they could have filed suit as of May 1, I think that's what's going to trigger it from my read of this case. So do you want to speak to that? Yes. Let's use May 1. But then I want to speak to the eviction date. On May 1, they do not have any cause of action because if they were to file the action saying, what could they say? You didn't move in on time. Well, it's May 1. We have time to move in. Well, you didn't file the necessary paperwork. Well, that paperwork isn't due yet. You didn't stay. You can't prove the case until the time in the future. But I want to speak to... But let me just ask you, because the rent ordinance at issue here prohibits the landlord from, and I think it says, endeavoring to recover possession of a rental unit on an invalid basis and describes the three month period in which the landlord has to move into the property as some evidence that the landlord evicted the tenant in bad faith. And so I guess my question, is it your view that the owner move in eviction under this ordinance is never wrongful until the property owner fails to move in to the unit as expected, even if at the time of the eviction, they had intention, no intention of ever doing so? To me, your honor, this is not semantics, but it's, I understand Guyico's argument and the point you're making is, well, don't you all look back in the rear view mirror? But the fact is, none of the facts that are relevant to that determination can happen until the future. Assuming that the Nicardes had evicted the Venegases with no intention of ever using the property as their principal residence, would that have been covered under the policy in your view? Yes, but for a different reason. Number one, I disagree with the ability to prove intent just in a vacuum, but I do want to speak to this eviction date because in this case, as we pointed out in our brief, if the issue that the court is now focusing on is that the event has to occur during the policy period, these plaintiffs were not interrupted in their tenancy until May 12th. That is the only date that they were evicted. It was the only date that my clients sought to evict them or sought to disrupt their tenancy. The notice to terminate their tenancy was served on March 13th and gave them 60 days. So if we're looking at when were their rights, when were they evicted? They were not evicted until May 12th at the earliest, and that was while the GEICO policy was in force. So even under the evaluation of looking at the event as the trigger, the actual date that my clients sought to evict them, and they could have stayed there until May 12th, their rights were not interrupted until while the GEICO policy was in place. But the tenancy was terminated before then, I mean by a mutual agreement. The Venegases were on a month-to-month tenancy, and everyone agreed that the Venegases would move out by the end of April to avoid having to pay pro rata rent in May. Why isn't that enough to conclude that the tenancy was terminated by mutual agreement at the end of April? I can answer that question or I am losing my five-minute rebuttal period. You are. Go ahead. There is no – the record does not reflect an agreement. What it reflects is they could stay there until May 12th, and because of the location of my clients and the plaintiffs who were still in the process of moving their things on April 29th, it goes to show when my clients left, they did not close the door behind them with the Venegases in the street. My clients left on April 29th with the Venegases. But they left because they had been evicted, right? The evictor noticed it happened. I have seven different record sites where your clients averred that they took possession on May 1st. They were responding to a form that they have to respond to for the city, and they interpreted that form to say, well, we didn't get rent after April 29th. So that's how they answered that question. Do you have some authority? I mean, what's your – because it seems like what you're claiming, I don't know if there's any cases or anything you could cite to suggesting that a landlord doesn't have to retake possession of property until they exercise possession, particularly in the context of a month-to-month tenancy where the parties have agreed that no rent would be due after, you know, a certain month. Is there any best case that you can cite? I honestly think Stilvey is the closest on point. But when I keep coming back to this court, the focus of this case is an insuring agreement that attempts to cover nine completely unrelated courts, and it does so ambiguously. And we're focusing on something rather than – as a trial court, didn't focus on the language of their policy and just created a one-size-fits-all rule. And I respectfully submit that is contrary to California law. Do you want to reserve the balance of your time, Mr. Capo? Yes. Okay, thank you. Thank you, Your Honor. Mr. Knapp and Mr. Wagner, it looks like you both want to argue on behalf of GEICO. Is that correct? Yes, Your Honor. Mr. Knapp is going to go first. And Mr. Knapp, you're going to take ten minutes or five minutes. Is that right? I think that we had stated it would be ten minutes, Your Honor, and then Mr. Wagner would take five minutes. But I'll try to wrap it up before then. Okay. Well, just – if you go over, you're going into Mr. Wagner's time. Okay? And Mr. Knapp, I can barely hear you. Okay. Can you hear me now, Your Honor? I'm going to work at it. You're just going to have to keep your voice up, I think, please. Okay. I want to make sure that's – is everyone else having an okay time hearing me? I'll keep my voice up. Is that better? Yes. Thank you. And may it please the court. The policy incepted on May 8, 2017, and the undisputed facts at the time of the tender established that the eviction had occurred prior to the inception of the policy. All of the events that constitute an eviction had occurred. But the facts are undisputed for two reasons – or undisputable for two reasons. First, the underlying claimants themselves asserted in the complaint that they were evicted on April 21, 2018, or that they vacated, excuse me, pursuant to an eviction notice on April 21, 2018. Second, in forms filed, as Judge Christin noted, in forms filed with the San Francisco Rent Board, appellants certified on three separate occasions under penalty of perjury that they recovered possession of the property no later than May 1, 2018. So there is an indication in the opening brief that the district court somehow decided a disputed fact, improperly decided a disputed fact. Our response is that there was no dispute about the fact that the eviction had occurred prior to the policy period, which, again, incepted on May 8. Counsel, may I ask, do you think I'm thinking about this incorrectly? Because there is the statute of limitations issue and the authority for the same. I don't think that the discovery rule is going to be helpful to me. That's an outside reason that the statute might not bar a suit. But opposing counsel's argument in response to my question was that they couldn't have, the tenants couldn't have filed suit as of May 1 because they didn't have a completed tort. Do you want to respond to that? And my response would track what Judge Murguria said, which is that there is no requirement under the San Francisco rent ordinance that a claimant or a former tenant show that the landlords didn't move in within three months. Right, but how could they have filed suit? They would have to say, our theory is that this is a bad faith eviction, and it really gets to be a problem of proof, doesn't it, at that point? That's what I understand counsel's argument to be. They would be, at that point, they would have a heck of a problem of proof, it seems to me, but I'm not sure that means they wouldn't have an action for bad faith eviction. And I would agree with that. I think there could be a proof issue at that point, although if they filed suit right after the eviction, they probably wouldn't get a chance to take a deposition for a number of months, and it would probably all flow out. But I do understand what Your Honor is contemplating there. And the most direct response is that under the language of this policy, the policy is not triggered by a cruel of a cause of action. The policy is triggered by injury. And here it's an injury arising out of a wrongful eviction. Mr. Campbell seems to rely heavily on Sylvie. What's your response to that? To the Sylvie case, again, that case simply, it was just a standard conventional application of the discovery rule. So the tenants had been evicted, and there was a time during which they didn't know whether that eviction was wrongful or whatnot, and they came to discover it later. And so there was a holding that, again, a standard holding that the discovery rule would apply there. But what if on May 1 they couldn't get passed formally? They would really just have to file a complaint that says, on information, we believe that this eviction is bad faith. If they couldn't get past 12B6, do they have a completed cause of action? As of May 1. If they really wouldn't have any proof of it? I believe they could. I mean, again, we're kind of speculating here, but my main response to the question, and very respectfully, my main response to the question is that we are barking up the wrong tree. The accrual of the cause of action or the time at which the tenants began to think of it as wrongful are not events that trigger this policy. I'm not sure why not, counsel, because what triggers it is personal injury, right? They have to be able to show a completed injury. If we don't measure it by all of the elements having transpired so you could allege the tort, how would we measure it? Well, again, the standard under the policy, the language is injury, not discovery of wrongfulness or that kind of inquiry. Well, if you go down that path, you might be playing into opposing counsel's hands because his argument is they didn't really have to leave until May 12. Okay. So we can talk about that piece of the case as well. Let me also just, again, reiterate for the court that the established California law with respect to the nature of an injury caused by a wrongful eviction is that the essential injury is dispossession of the tenants from the premises. And if I could, I'll quote the First District Court of Appeal in the case of Swain versus California Casualty Insurance Company, which is cited in the brief. The court held the act of dispossession, whether lawful or not, quote, inflicts an obvious harm to an important interest, the claimant's interest in a leasehold, a place of shelter, a home. The harm is obvious and it's substantially certain to occur. So that's the damage element. If you think of it as an element, that's the damage. And I think you're spot on. And what he's arguing, of course, is that it hasn't been proven at that point to be unlawful. Correct. And so that is the question. I suppose that is a question for the court to examine whether this policy is triggered by the time at which the tenants become aware of the wrongfulness of a previous injury. Well, I guess here then, how relevant are the injuries the Venegas' allege in their complaint in the underlying wrongful conviction action for determining the injury arising out of wrongful conviction? I think they allege loss of rent-controlled apartment, moving expenses, emotional distress, among other things. True. So if we assume, which I think is really the only reasonable assumption here, that this eviction did occur and done and dusted by May 1, 2018, pursuant to appellant's own certifications under penalty of perjury to the rent board, the question then becomes whether derivative harms in the form of higher rent and emotional distress allegedly sustained by the former tenants during the policy period, but which arose out of an eviction that took place prior to the policy period, would satisfy the policy period limitation of the GEICO policy. And we believe the answer is categorically no under California law. The reason, first and foremost, is because the argument proves too much. Under appellant's interpretation, a tortfeasor could purchase a policy after committing the tort and thereby enjoy coverage for its yet-to-be-unfolded consequences. I'm quoting Harbor vs. Insurance Company, 2nd District Court of Appeal, which is cited in the brief. An interpretation of the policy to this effect, the Harbor Insurance Company court stated, would be entirely unreasonable and cannot be reached as being within the reasonable expectations of the insured. What counsel is arguing on the other side is that there was a longer notice period. The eviction notice was served on March 13th, 2018, and it was a 60-day period, and therefore it expired on May 12th, 2018. The facts establish that the lease had been terminated, the tenants had vacated, and the legal relationship, again, had been terminated and ended. Nothing happened on May 12th. Literally nothing. Nobody took it. I guess counsel could describe the failure of the landlords to assert possession during that interim period between May 1 and May 12, but otherwise, again, nothing happened. So when did they lose their rent-controlled apartment? What's the date you think it happened? Did it happen the day they were served with the notice? I believe it did happen the day that they were served with the notice, but at the latest, and I'm out of time now, at the latest that occurred on, it would be April 30th or May 1, 12 midnight. Thank you, counsel. Do you make a distinction between the wrongful eviction as an occurrence and the personal injury? That is, the district court held that the wrongful eviction had to take place during the policy period, but your policy says that the injury had to take place during the policy period, which would be an injury arising out of the wrongful eviction, not the eviction itself. So do you disagree with the district court interpretation of the policy, or are they one and the same? The injury arising out of the wrongful eviction, as the language of the policy indicates, is the injury of dispossession. That is what is referred to. That's the sine qua non of an eviction, the dispossession of the tenants from the premises. So that injury occurred prior to the policy period. The question is whether these derivative injuries, ongoing, that really, according to appellant's interpretation, they would be ongoing and they would extend indefinitely into the future, allowing the insured to claim coverage years later. I think the statute of limitations under the rent ordinance is five years, and that's not taking into account the discovery rule. So theoretically, they could wrongfully evict a tenant and then seek coverage under a policy issued four years later for those derivative emotional harms or increases in rent. And again, under the Harbor Insurance Company case and other cases in that line, in particular the malicious prosecution cases, that it's just not a reasonable interpretation of the policy. The policy, incidentally, was— Did you want to give your colleague here some time because you're well beyond it? Full stop. I apologize. Jim, please. About three minutes. Mr. Waxman. Thank you. Did they have a cause of action on May 1st? Yes, they did. The mere fact they don't have sufficient evidence to go to court under Rule 12 doesn't mean they don't have a cause of action. There could be, for instance, a polygraph test. There could be truth serum. There could be all kinds of ways to prove something. Sure, that's unrealistic. If you're asking the theoretical question, when did they have a cause of action, they had a cause of action as of the day they were dispossessed. As of that day, they suffered emotional distress. As of that day, they had to pay rent for a new apartment. I don't think damages are the issue. And I agree with everything counsel said about consequential damages. They just need to have a completed cause of action. So what if they couldn't get past Ipval Twombly? Well, I think—see, I think—you mean a 12b-6? I don't think that makes any difference whether they have a cause of action or not. They have a cause of action just because they cannot go to court with a lawyer who's bound by Rule 12 and says, yes, I know enough information to say I can put my signature on this plea deal. That is the definition of a 12b-6. You just say the claim upon which relief may be granted. Right. They could state it. The question is could they prove it or not. They might not have had the proof in their hip pocket then, but that doesn't mean they couldn't get it later, and it doesn't mean they actually didn't have it. There may have been something that occurred. The Nankardis could have said something to a neighbor. There's a bunch of ways to prove intent besides merely the fact of failing to move in within nine months. I think that's your strongest argument. We don't know that they didn't have it. We don't know that they didn't have it. What I'm doing is trying to respond to this notion that a discovery rule, which would allow them to kick it out to a point where they could say, well, before this we were in a position where we could say we knew or reasonably should have known. And, of course, what they're arguing is that this was bad faith from the inception. But mere discovery doesn't change the date that something occurs, and there can be different reasons. No, it's a tolling rule. That's my point. It's a tolling rule. And it's based on a sample. And so if there's no detrimental reliance or something like that, then there's no tolling. So it all goes back to when the cause of action occurs, which is when the dispossession occurs. And then the only other thing I would like to point out, two other things with my 52 seconds left, I would ask the court to look at the definition of damages. When Mr. Campo went through the different elements of the policy, if you look at damages, it says the definition says damages is an amount which must be legally paid or unlegally paid or have to be insured. That's the equivalent of language in a lot of insuring agreements. It says that damages must be – the insured must be legally obligated to pay. So the question you have to ask yourself, that's a judgment, of course, but did the tort occur as of then, as of May 1st? Yes, it did. And then the only other thing I'd like to add in conclusion, Your Honor, is that all this comes down to an issue of interpretation. Of course, we know all about ambiguities and all that stuff. We've heard about that stuff for years. The real question is an interpretation is only – you can only go to a different interpretation if it's a reasonable – if it's within the reasonable expectations of an insured. An insured could not reasonably expect to evict somebody and go out two weeks later and buy a policy and have it covered. That just doesn't make sense. Thank you very much for your time. Judge McKee, may I ask one question? Sure, yes. Counsel, you're moving kind of fast there. I recognize you had, you know, 42 seconds left, but here's your definition, right? Damages an insured must pay, one, legally, two, by agreement of our – with our written consent, because of personal injury or property damage covered by this policy. That's the definition. You just asked us to look at that. I'm looking at it, but I didn't understand. I think you're moving a little too fast. What's your argument vis-à-vis this definition? What the argument I was trying to say is that there has to be a legal obligation. Even though this insuring language doesn't utter the phrase, damages which the insured is legally obligated to pay, the phrase damages an insured must pay is the functional equivalent. So if you're looking for that, when you look at other insurance policies, you want to know where it is in the policy, that's where it is. Let me ask a question. Mr. Knapp, if I could, before Geico rests here, you kept referring to harbor insurance.  And I'm just trying to figure out how do we square the concern announced in harbor insurance century that a tortfeasor could purchase a policy such as this after committing the tort and thereby enjoy coverage for its yet-to-be-unfolded consequences with the decision in Montrose that permits coverage of occurrences that happened prior to the policy period but result in injury during the policy period, so long as there was uncertainty as to whether the injury would occur. How do you square that? I don't know if either one of you, Mr. Wagner, Mr. Knapp. I could take a shot at it if I could, Your Honor. The Montrose case, of course, is talking about prop damages, and prop damages inherently is the kind of damage that can continue, as we all know from our experience. A wrongful eviction when it occurs is an immediate injury. But just like an auto accident, someone can get injured in a car accident. They can have lingering effects for years and years and years. This is one I agree that Montrose says is not contrary to public policy under insurance code section 22 and 250 to have insurance that goes into effect after a loss has commenced. But it still goes down to a question of policy language. That's really a matter of public policy. You simply look at the policy language and ask yourself about the expectations of an insured and what an insured would reasonably expect upon reading this policy to think, yes, I can buy this policy a week after I evict these people and be covered when they later discover that I acted in bad faith. All right. Thank you very much. Mr. Campo? Yes, I'd like to dovetail right into what you were just discussing because I think it's imperative. As Mr. Wagner just acknowledged, you can have an ongoing property damage claim. You can have a 55-gallon drum of chemicals still on a property. They run over, pick it back up. That stays on the ground, continues to cause damage for years and years and years. That's Montrose. That's continuing damage. You're still exposed to the same injury-causing event. You have the same thing in Armstrong with bodily injury and going to work each day where there's asbestos. You're still exposed to the event. Wrongful eviction has no one cause of action. There's no casey instruction. There is no one type. And under the code, you have two parties, the Vanegas' and the Nadkarni's,  And as long as they are not there, they are continually exposed to the same conditions. Exactly what the Geico policy agrees to pay for. You have an ongoing tort until the Vanegas', I'm sorry, the Nadkarni's offer it back, give it back to them. But there is an ongoing tort. It is not like an auto accident. An auto accident, bang, collision, they go their separate ways. They are never exposed to each other again. And this is paramount. Geico uses a single insuring agreement to try and capture nine, maybe it's even 11 different torts. It's crazy. It is confusing. It is ambiguous. And they do not identify what has to happen. But as we've shown, if you actually look at the date of eviction, if that's what the court wants to focus on, the actual date these people were told, you lose your rights, was during the Geico policy. And damages occurred at all times thereafter. And Montrose explicitly authorizes people to protect themselves from the imposition of liability. And the burden is on the carrier to cut that off. And that's what most carriers did after Montrose. They put in Montrose exclusion. They try to limit continuing damages. And the reliance on harbor is crazy because that policy that was interpreted was the Argonaut policy, and it explicitly had the language. If such offense is committed during the policy period, that is what is missing from the Geico policy. We are trying too hard to save what is fatally flawed language. When you look at the facts alleged by the plaintiffs, they allege you didn't move in in 90 days. They allege that you didn't file the proper notices. Those are the facts that are alleged as the theory of liability. We're talking about wrongful eviction in a vacuum, and we're falling into the same mistake of coming up with a one-size-fits-all result. That's not what the law requires in California. Are you saying that the eviction itself, we know that didn't occur within the policy period, but let's say that emotional harm occurred after the policy period. So would you call that an additional injury because it occurred within the policy period? That is to say it was a personal injury that didn't arise until two weeks later. But then that would mean that the injury of the wrongful eviction would be outside the policy period. As I've indicated, the actual stated date of eviction was in the policy period, but if we're going to assume it happened before, the explicit language of the Geico policy that it pays for damages that arise out of an eviction, it allows for the precipitating event to come before as long as there's damages. And to answer your Honor's question, yes, these are two parties competing for possession, and every day that one is held out of possession is an ongoing tort like the chemical on the ground and the asbestos at work is an ongoing condition explicitly covered by Geico, and it continues to increase in damages. Every month there's another month's rent. Every month there's another month's rent. The damages and the event both continue all throughout the Geico policy period, and this is completely supported by California law. All right. Does anybody have any other questions? Judge Lefkoe? No. Judge Kristen? No, thank you. Okay. Mr. Campo, Mr. Knapp, and Mr. Wagner, thank you so much for your oral argument presentations here today. It's greatly appreciated. The case of Geico v. Ashwodan Nadkarni is now submitted. Thank you. Thank you to the court.
judges: Murguia, Christen, Lefkow